## Commonwealth *v.* Roffel, Appellant.

Argued January 21, 1929. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*Jay C. Bossard,* with him *Robert A. Pannebaker,* for appellant.—Where a conviction of murder is obtained on circumstantial evidence alone, the facts proved exclude every reasonable hypothesis of guilt to the extent necessary to sustain a conviction: Com. v. Byers, 45 Pa. Superior Ct. 37; Com. v. Exler, 61 Pa. Superior Ct. 423; Com. v. Bone, 64 Pa. Superior Ct. 44.

Under all the evidence it was the duty of the trial court to charge the jury that if they found defendant guilty, the degree of guilt could not be greater than murder in the second degree: Com. v. Drum, 58 Pa. 9.

*Charles F. Kelley,* Assistant District Attorney, with him *John Monaghan,* District Attorney, for appellee, cited: Com. v. Delfino, 259 Pa. 272, 277; Wharton, Cr. Ev., 10th ed., 906.

OPINION BY MR. CHIEF JUSTICE MOSCHZISKER, February 11, 1929:

George Roffel has appealed from a sentence to life imprisonment for murder of the first degree. He was

indicted separately for killing Henry Webb and Charles Jones, who were shot at about the same place and time. The present appeal grows out of defendant's trial on the Webb indictment, though much of the evidence in the case necessarily refers to both charges; no complaint, however, is made on that score, the only assignments being that the court below erred in refusing binding instructions for defendant, in overruling certain objections to his cross-examination, and in not withdrawing a juror when requested.

The tragedy which caused the indictment of defendant occurred on the premises of the Real Estate Trust Company, at the southeast corner of Broad and Chestnut Streets, Philadelphia. The trust company occupies the northwest and a portion of the southeast sections of the ground floor of a large office building, for its banking office and safe deposit department, respectively; it also uses, as part of its banking enclosure, certain sections of the basement, toilet and locker rooms being located there for the use of the company's employees. There is an entrance to the building on Chestnut Street, which leads into a main corridor, extending south, and an entrance on Broad Street, which leads into a side corridor, extending east; these corridors join and form an "L." At the east end of the side corridor is the door to the safe deposit department, and on the north side, an entrance, with a grille gate, which leads into the banking room; but the principal entrance to that department is from the west side of the main corridor just inside the Chestnut Street entrance to the building, which is closed at night, the Broad Street entrance only being open during night hours. While public corridors separate the ground floor offices of the company, and the several sections of the basement used in connection with its business are also separated from one another, yet there are inside avenues of communication between all parts of the company's enclosure. In the safe deposit department, a stairway leads up from the ground

floor to a mezzanine, from which there is communication by a stairway to the banking department. Two separate stairways lead from the banking department to the locker room below, and the stairway in the safe deposit department goes down to the portion of the basement directly beneath it, used by the company, from which communication with the toilet room under the company's banking department is had by means of a tunnel, the western wall of this passageway standing between it and the boiler-room of the building. From five o'clock in the afternoon until the following morning, guards were always maintained inside the company's enclosure, and iron-barred doors prevented access by outsiders.

Defendant, Webb, Jones, and one John Newbaker, were employed as bank guards and cleaners by the trust company. These four men, of whom Jones was the supervisor, were on night duty, in the banking and safe deposit departments, the evening when Webb and Jones were killed. They had all come to work, as was their custom, at about five o'clock in the afternoon, and from that time until the murders occurred, all four were within the rooms, passageways and basement sections forming the bank enclosure, which was regularly locked up for the night. Besides these guards within the enclosure, outside watchmen and elevator operators were stationed, as usual, in the corridors.

The customary activities of the four inside guards, with whom we are chiefly concerned, was briefly as follows: After changing to work clothes, they cleaned the premises, under the supervision of Jones; this labor was usually finished at about 10 o'clock, then they ate a lunch. Throughout the night they patrolled the bank enclosure, and, at regular intervals, rang the signal stations located at various places therein. All four had been working together in the employ of the trust company "for a long time prior to December 17, 1927," the date of the killing.

On the evening in question, a little after seven-thirty, shots were heard, and Roffel came to the grille gate between the banking room and the side corridor, calling to one Mumford, a guard in the corridor, "Get a cop." When, a few minutes later, defendant admitted a policeman (summoned by Mumford) and other persons to the enclosure, Webb was found on the floor of the bank, and Jones on the floor of the basement at the foot of the stairway leading from the safe deposit room, both mortally wounded. They were taken to a near-by hospital and died in a short time. Roffel was arrested that night, after a police investigation, and held as a material witness; subsequently, he was indicted for the killing of both men, and tried for the murder of Webb.

The Commonwealth produced as witnesses everyone known to be on the first floor or basement of the building, sufficiently near the scene to have knowledge of the situation before and after the shooting, and also several members of the city police force, who were connected in one way or another with the case.

The testimony of Newbaker, the fourth bank guard, was in substance uncontroverted. He was in the basement toilet room, shaving, at the time of the events now under investigation. A few minutes previous to going there, as he "stepped on the landing just before descending," he "saw Harry Webb standing in front of the teller's cage." The witness then went to the basement, "rang the two last stations," sat down for a few minutes to arrange some papers found on the floor, and, "about midway in the locker room,......met Charlie Jones on his way over to the safe deposit department." Some five or six minutes after that, he heard "two loud reports......explosions, in quick succession," which he mistook for the backfiring of an automobile; then, in a few minutes more, "a noise at the front of the toilet room,—a sort of shuffling noise,—[and as he] hurried forward, to see what it was, [he] heard George Roffel

call out, 'Where in hell are you? Two men have been shot.'"

Besides Newbaker, the only men in the building who were close to the scene were Mumford, the night guard stationed in the corridors, Llewellyn, a watchman, also stationed in the corridors, and Truitt, an elevator man, who sat facing the grille gate leading into the banking department. On this particular evening, the glass door, which could have been closed with the grille gate, had been allowed to stand open, and the interior of the banking department was fully lighted. Mumford and Truitt were just outside the grille while Llewellyn was in the corridor near the entrance to the safe deposit department. Of these three men, called as witnesses by the Commonwealth, Mumford and Truitt heard, before the shooting occurred, the voices of men quarreling within the bank enclosure; in general their testimony agrees.

Mumford said that, about a month prior to the night of the shooting, Roffel had remarked in his hearing that "Webb was no good." Concerning the events of the night in question, Mumford testified that he heard Jones, the foreman, as he passed the grille gate, say to someone inside, "You will have to do it, that is all about it." He heard men quarreling; heard someone say "Oh, oh," and then a shot; he immediately looked into the banking room and saw Roffel coming toward the grille, who said to him, "Get a cop, this is a hospital case," and, turning to a police box in an alcove by the grille, said aloud, as if telephoning, "Send ambulance, hospital case."

Truitt, the elevator man, was, like Mumford, near enough to the place where Webb was killed, by the single bullet which entered his body, for the noise of the gun-fire to have been carried to him. This witness testified that he heard "loud voices ['in anger'] and immediately afterwards......Roffel's voice say, 'You are a God damned liar,'" then, in "a matter of seconds," he heard a shot, someone groan and say "Oh, oh." Next, he looked through the grille and saw defendant walking toward

him, "with something in his left hand." The witness said that, when he asked what the "trouble" was, Roffel's only response was, "Call a cop; the dirty sons-of-bitches." Truitt went for a policeman. No inquiry was made of this witness as to what the accused had in his left hand, though counsel for the accused served notice that he would ask leave to recall Truitt, later on, as a witness for defendant; but this was not done.

Llewellyn, though somewhat further removed from the scene of the shooting of Webb than Truitt and Mumford, testified that he also heard a shot; and, on looking in at the grille gate, saw the defendant moving around on the inside, saying something about "the God damned sons-of-bitches," and "get a cop, there are two men shot here"; that Roffel then turned to the police box and appeared to be talking. But, the witness added that *he heard no buzzing sound, such as occurs when the box is used.*

Mumford and Truitt, accompanied by Egan, the traffic policeman summoned by Mumford, returned to the grille together, and saw Roffel inside at the police box, acting as though he were making a call. The policeman testified that defendant was "fussing around," "all excited," and that, in spite of his, Egan's, shouting to be let in, Roffel kept them at the gate fully two minutes. When defendant finally admitted them, he started back toward the police box, but Egan asked him to show them where the two men were; whereupon Roffel took him to where Webb lay, and said, "There is the gun lying there"; then he "immediately went away." Egan further testified, as did Officer Balk, the policeman summoned to the scene by Truitt, that Roffel made no move to help carry either Webb or Jones out of the bank. In each case, he directed the police to the body and at once left the scene.

The Commonwealth proved that the three bullets produced at the trial, one of which was taken from the body of Webb and the other two from the body of Jones, came

from a thirty-two calibre revolver picked up near the body of the former; and that the absence of powder burns (as distinguished from stains) on the clothing or body of either man showed that the shots must have been fired from a greater distance than would be consistent, under the circumstances, with a theory of suicide. An expert testified that the bullet which killed Webb was smudged; that the revolver from which it was shot must have been used shortly before the bullet in question passed through its barrel, for a powder stain was carried onto the edges of the hole in the clothing over the wound, thus indicating that both Jones and Webb were shot by the same weapon, the former before the latter. The pistol which was found near the body of Webb was shown to be the property of the bank, regularly in the custody of its vault superintendent, Conover. It was kept in the middle drawer of the superintendent's desk, and was readily accessible to the guards. When confronted with this weapon, defendant said he had never seen it before and was not familiar with the desk in the safe deposit department in which it was kept. To controvert this, the Commonwealth produced Conover, who testified that every one of the guards was aware that this revolver was kept in his drawer; further, he said that this weapon was actually there the morning of Saturday, December 17, 1927, and he knew it then contained two gas shells and three loaded cartridges. Newbaker, the fourth bank guard, testified that he, for one, had knowledge that a revolver, such as the weapon produced, was always kept in the drawer of Conover's desk. Conover said that, on the morning after the shooting, he found the two gas cartridges, which he had left in the pistol, in his desk, intact, and the coroner's physician testified that the three bullets which he removed from the bodies of Webb and Jones were out of cartridges the shells of which corresponded to the empty shells produced by the Commonwealth, fitting the Conover revolver; thus it is apparent that the one who

perpetrated the murders with this pistol, had removed the nonfatal gas shells, so as to make sure to kill.

When defendant took the stand in his own behalf, he testified that, about 7:30 o'clock on the evening in question, in the course of performing his regular duties as bank guard and cleaner, he descended the stairs leading to the basement, beneath the safe deposit department, and suddenly came upon the prostrate form of Jones, who, he thought, must be having a "spell," such as he had seen him suffer on a previous occasion; "in order to summon help, [he] ran......into the locker room calling for John Newbaker, and went up one of the flights of stairs leading into the banking department"; he then saw Webb, lying on the floor, with a revolver beside him, and ran toward the door (or grille gate) leading into the side corridor, calling for John Newbaker; he saw the guard Mumford standing outside, to whom he said, "Get a cop"; he then communicated with the 12th and Pine Streets police station by means of the police box near the door. He said that he showed Officer Egan, who had arrived on the scene at the behest of Mumford, where Jones was lying, and helped to carry him out; that at no time during that evening had he heard any shots fired; that he bore no ill-feeling whatever for either Webb or Jones and had had no altercation with either of them on this evening in question; finally, that he did not shoot them.

As affecting the credibility of defendant, it was proved that, in 1924, he was convicted of shooting another man, and sentenced to one year's imprisonment. This item of evidence is not assigned as error, nor is any attack made upon it.

The Commonwealth produced two witnesses to rebut defendant's testimony that, when he went to the police box in the alcove near the grille gate, he had telephoned the district station and directed them to "send a wagon to the Real Estate Trust Company," saying "there is a hospital case," that he heard the answer, "All right,"

and that, in a few minutes he returned to the police box, called the station house a second time, and asked, "How about that wagon for the Real Estate Trust?" to which he got the answer, "The wagon is on its way," whereupon he opened the door to allow Officer Egan to come into the bank. Police Sergeant Fuhs testified for the Commonwealth that he was the house sergeant stationed at the district office connected with the police box which Roffel claimed to have used; that, on the evening of the shooting, he received and recorded all calls which came in, and none arrived from that particular box; that, according to his memory, verified by his official record sheet, no police call of any description had been sent from the box in question at any time near to the hour Roffel claimed he had used it. In substantiation of this, Officer Schaeflein, who assisted Sergeant Fuhs on that evening, testified that no call had come to him from the police box in the Real Estate Trust Company, and that he had neither engaged in nor heard anyone else at the station engage in "phone conversation such as that alleged by Roffel."

On cross-examination, Roffel reiterated that he had heard no shots on the night of the homicide, and denied having told Police Corporal Labov,—with whom he talked, at the bank, shortly after the removal of the bodies,—that he heard one shot. In contradiction of this, the Commonwealth produced Labov and Officer Lowery, both of whom testified that the former had talked that evening with Roffel about the matter, and "asked him, did he hear any shots down here,—meaning in the basement—[and Roffel] said 'No: I heard one upstairs.'"

Defendant offered evidence that there was a hole, high up, in the western wall of the previously described basement passageway, seeking thus to show that some outside culprit might have gained access to the bank enclosure and committed the crime on trial; but there is nothing to confirm such a theory. Whether the hole

in question was of such a size, so located, and so unob-
structed that a person could enter in that way, go to
Conover's desk, take the pistol with which the crime
was committed, remove therefrom the gas shells, go
to the locations of the two shootings, commit the mur-
ders, and then escape, so as not to be seen by others
in the building, and whether it was possible that some-
one from outside did so enter and commit the crimes
and then escape, were questions for the jury to consider;
the probability of such occurrences is too remote, how-
ever, to cast any reasonable doubt upon the propriety
or justice of the verdict.

Newbaker, who heard the two shots, was in the base-
ment, where the body of Jones, containing that number
of bullets, was found, and all the other witnesses, who
heard but one shot, were on the ground floor of the
building, near the spot where the body of Webb, which
contained one bullet, was discovered; so the fact that
the first witness heard two shots, and the other witnesses
but one, is thus accounted for. The testimony of these
witnesses, and other evidence in the case previously
pointed out, show that, of the two murdered men, Jones
was the first to be shot, and, according to defendant's
own story, he, Roffel, found the body of Jones in the
basement at a time which, other evidence in the case
indicates, must have been almost immediately after
Jones was shot; further, defendant's own story shows
him to have been on the bank floor, where the body of
Webb was found, approximately at the time when the
latter was shot. The jurors evidently believed, as they
were warranted in doing, that, instead of making some
personal effort for the immediate relief of the two
wounded men, defendant pretended to call the police,
using for that purpose a telephone, or police box, where
the speaker could easily be seen by persons in the cor-
ridor, when there was another box much nearer; and
that defendant, in his feigned talk to the police, stated
they were needed for a hospital case, though, according

to his own story, he had heard no shots and had not examined the bodies. In short, when the evidence is read as a whole and the facts are kept in mind that it excludes from the bank enclosure, at the time of the commission of the murders, everyone except Roffel, Newbaker and the two deceased, that it indicates the accused was in the basement when the shot which killed Jones was heard and in the banking room when the shot which killed Webb was fired, that it contains nothing to suggest the guilt of Newbaker, that it shows defendant knew where to find the particular pistol with which the murders were committed, and omits to show any explanation by him of his profanity and apparent anger towards someone at the time in question, when these pregnant facts and the numerous others indicating guilt of defendant are remembered, it is plain that, though the evidence was circumstantial, the record does not fail in proof beyond a reasonable doubt to sustain the verdict of the jury.

Certain questions by the prosecuting attorney, cast in the form of statements, objected to by defendant, and the court's rulings thereon, are assigned as error. Counsel for the Commonwealth, on cross-examination, asked defendant, "Isn't it a fact that you shot both of them [Webb and Jones], and that is the reason you did not help to carry either one of them out?" To which defendant answered, "I helped to carry Webb out." Then the question was asked, "And isn't it a fact that you held them [the police] at the door two minutes, so that Webb could die and couldn't tell who shot him?" To which defendant answered, "Positively no." A motion to strike the questions and answers from the record, and a further motion for the withdrawal of a juror, were both refused.

Considerable latitude is permissible in cross-examination, particularly in a case like the present where the defendant took the stand to overcome circumstantial evidence strongly indicating his guilt. In view of de-

fendant's failure to attempt personal aid to the wounded men, and considering the testimony of Egan that Roffel had kept him waiting at the door two full minutes while he, the defendant was "fussing around" inside, it cannot be said that the trial judge abused his discretion in allowing the cross-examination of which appellant complains. The whole body of the evidence showed that defendant was accused by the Commonwealth of killing both Webb and Jones, so asking him whether he shot them was merely reiterating this charge; and since the last part of the first question above stated gave defendant an opportunity to assert, in contradiction of the witnesses produced by the Commonwealth, that he had in fact helped to carry Webb out, he could have suffered no undue harm from the question as a whole. The suggestion made by the prosecuting attorney in the second question was one that, on the evidence in the case, he might have argued to the jury, and putting it in the form of a question afforded defendant an opportunity, of which he took advantage, to enter a denial. We see no abuse of discretion in the refusal to strike these questions and answers from the record, or in the refusal to withdraw a juror.

What we have already said as to the sufficiency of the evidence to sustain the verdict, is enough to dispose of all defendant's other contentions.

The judgment is affirmed, and it is ordered that the record be remitted to the court below to the end that the sentence imposed may be carried out.